**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**MISTY JOLENE TOOHEY,**

    **Plaintiff,**

                              **Civil Action 2:20-cv-02555**

    **v.**                          **Chief Judge Algenon L. Marbley**

                                **Magistrate Judge Chelsey M. Vascura**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income benefits ("SSI"). This matter is before the undersigned for a Report and Recommendation ("R&R") on Plaintiff's Statement of Errors (ECF No. 15), the Commissioner's Memorandum in Opposition (ECF No. 16), and the administrative record (ECF No. 14). Plaintiff did not file a Reply. For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability determination and **REMAND** this matter to the Commissioner and the ALJ pursuant to Sentence Four of § 405(g).

### I.        BACKGROUND

Plaintiff apparently filed two previous applications for SSI. (R. at 16.) Both were denied at the administrative level; the Appeals Council did not disturb those administrative determinations; and Plaintiff did not seek judicial review. (*Id.*)

Plaintiff protectively filed her current application on June 23, 2014, alleging that she became disabled on January 1, 2006.[1]  (R. at 376, 542–47.)  Plaintiff's application was denied at the administrative level and a hearing was held before Administrative Law Judge Earnhart on February 6, 2017, who issued an unfavorable determination on April 19, 2017.  (R. at 266–97, 397–416, 431–50.)  The Appeals Council granted Plaintiff's request for review, vacated the April 19, 2017 decision, and remanded the case.  (R. at 424–27.)  The case was assigned to Administrative Law Judge Lesperance ("ALJ"), who held a hearing on February 19, 2019, and issued an unfavorable determination on April 9, 2019.  (R. at 16–38.)  The Appeals Council denied Plaintiff request to review that determination, which consequently became final.  (R. at 1–4.)  Plaintiff seeks judicial review of that final determination.

With regard to her physical impairments, Plaintiff alleges that the ALJ committed reversible error by using the term "light work" in her residual functional capacity ("RFC")[2] instead of specifying how long she could sit, stand, and walk in an eight-hour workday. (ECF No. 15.)  Plaintiff also alleges that the ALJ erred by failing to conduct a function-by-function analysis when assessing her RFC.  (*Id*.)  In addition, Plaintiff alleges that the ALJ erred by failing to explain why Plaintiff was capable of frequent fingering.  (*Id*.)  With regard to her mental health, Plaintiff alleges that the ALJ erred by failing to consider the impact of her non-severe mental impairments when assessing her RFC.  (*Id*.)

---

[1] Plaintiff later amended her alleged date of onset to June 23, 2014.  (R. at 556.)

[2] A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations."  20 C.F.R. § 4040.1545(a)(1).

## II.     THE ALJ DECISION

On April 9, 2019, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 16–38.)  In her decision, the ALJ initially noted that because there was a final decision on Plaintiff's prior disability claim, she would be bound by the previous findings for the unadjudicated period that began after the prior decision was issued unless there was new and material additional evidence or changed circumstances.  (R. at 19–20.)[3]  The ALJ found, however, new and material evidence or changed circumstances, and thus that she was not bound by the previous findings.  (R. at 19.)

---

[3] The principles of *res judicata* provide that, in the absence of new and material evidence or changed circumstances, a subsequent ALJ is bound by the findings of a previous ALJ or Appeals Council decision.  *See* Social Security Acquiescence Rulings 98-3(6), 98-4(6); *Dennard v. Sec'y of Health and Hum. Servs.*, 907 F.2d 598 (6th Cir. 1990); *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997) as modified by *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018).  The parties do not challenge the ALJ's application of *res judicata*.

The ALJ then engaged in the sequential evaluation process. [4]  At step one, the ALJ found that Plaintiff had not engaged in substantially gainful activity since June 23, 2014, her application filing date.  (R. at 20.)  At step two, the ALJ found that Plaintiff had the following severe impairments: obesity, history of hernia with related surgical repair, recurrent kidney stones, interstitial cystitis, irritable bowel syndrome, chronic obstructive pulmonary disease (COPD), history of partial lung resection, bilateral carpal tunnel syndrome, and history of plantar fasciitis.  (R. at 20.)  In addition, the ALJ found that although Plaintiff's affective, anxiety, and personality-related disorders were medically determinable, none of these impairments, considered singly and in combination, were severe.  (R. at 20.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically

---

[4] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(R. at 23.)  At step four, the ALJ determined Plaintiff's RFC as follows:

> The claimant has the [RFC] to perform a light work as defined in 20 C.F.R. 416.967(b) except she can occasionally climb ramps and stairs, and occasionally stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds.  She can occasionally operate foot controls. She can frequently handle and finger with her bilateral upper extremities.  She can occasionally work in extreme temperatures, humidity, and atmospheric conditions (as defined in *Selected Characteristics of Occupations* (SCO)).  She must avoid hazards such as working at unprotected heights or in proximity to exposed moving mechanical parts.

(R. at 25.)  The ALJ then relied on testimony from a vocational expert ("VE") to determine that in light of Plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff could perform.  (R. 37.)  The ALJ therefore concluded Plaintiff was not disabled under the Social Security Act.  (R. at 38.)

### III.     RELEVANT RECORD EVIDENCE

**A.     Plaintiff's Testimony**

With regard to her mental health, Plaintiff testified at the February 6, 2017, hearing that her depression and anxiety caused her to be forgetful.  (R. at 289.)  Plaintiff indicated that she had panic attacks but could not identify specific triggers.  (R. at 290.)  Her panic attacks only occurred once or twice a day when she was home alone but happened more often when she was out in a store or around a lot of people.  (R. at 290.)  She also testified to having difficulties with attention and concentration and that she had trouble finishing things she started.  (*Id*.)  Although Plaintiff stated that she shopped once or twice a month, she usually sent her daughter to do shopping.  (*Id*.)

With regard to her carpal tunnel syndrome, Plaintiff testified at the February 6, 2017, hearing that she could not do much cooking because of issues with her hands and feet, could not

push or pull a vacuum or sweep, and that her daughter and neighbor would help her.  (R. at 277–78.)  Plaintiff also testified that pain also limited her daily living activities.  (R. at 281.)  She indicated that she could microwave food and do basic cleaning, such as cleaning a sink, that did not require picking things up.  (*Id*.)  She could not, however, grip a coffee cup, do dishes, or open cans as she did not have a strong grip.  (R. at 285.)  Plaintiff stated that she experienced numbness, tingling, itching, and burning in her fingers and wore splints throughout the day and at night.  (R. at 285–86.)  She wore splints throughout the day and at night in bed.  (*Id*.)  Plaintiff wanted to have carpal tunnel surgery done after her bladder issues were addressed.  (*Id*.)  She could not lift more than five pounds.  (R. at 289.)

**B.**    **Records Related to Plaintiff's Mental Health**

   **1.**    **Treatment Records**

      **a.**    **Guernsey County**

Plaintiff sought treatment from this provider from September 11, 2013, until February 23, 2015.  On September 11, 2013, Plaintiff reported that she had not been in treatment for mental health issues since July 15, 2011.  (R. at 1164.)  A mental status examination that day revealed that although Plaintiff was oriented and her judgment and memory had no apparent impairments, her facial expression suggested sadness and depression, and her affect and mood were depressed, sad, and anxious.  (R. at 1161–62.)  An examination on September 23, 2013, however, demonstrated that Plaintiff had regular speech, clear and linear thought processes, no overt delusions, intact judgment and insight, no apparent memory impairments; her attention and concentration were within normal limits; and her language, knowledge fund, mood, and affect were all appropriate.  (R. at 1185–86.)  On October 2, 2013, Plaintiff reported that she was feeling "a lot better" now that she was taking Abilify and Vistaril, and that it was a "[h]uge, huge

relief." (R. at 1172.) Although Plaintiff reported that she was "going right back down" with her depression on October 16, 2013, she was still reportedly better than she had been before taking medication. (R. at 1174.) Mental status examinations on October 21, 2013, and November 18, 2013, were essentially the same as the examination on September 23, 2013. (R. at 1194–95, R. at 1203–04.) On November 19, 2013, Plaintiff reported that she felt even better had she had on October 2, 2013. (R. at 1177.) Plaintiff was taking Wellbutrin and Klonopin and she had no crying jags or outbursts and slept well. (*Id*.)

On January 13, 2014, a mental status examination again revealed that Plaintiff had regular speech, clear and linear thought processes, no overt delusions, intact judgment and insight, no apparent memory impairments; her attention and concentration were within normal limits; and her language, knowledge fund, mood, and affect were all appropriate. (R. at 1212–13.) Although Plaintiff's speech was soft on May 19, 2014, an examination that day was otherwise the same as it had been on January 13, 2014. (R. at 1221–22.) On August 11, 2014, an examination was identical to that on January 13, 2014. (R. at 1230-31.)

On September 24, 2014, Plaintiff reported that she felt she was doing a little better with her depression, and she rated its severity as a "6." (R. at 1180.) Mental status examinations on September 29, 2015, November 24, 2019, and February 23, 2015, again revealed that Plaintiff had regular speech, clear and linear thought processes, no overt delusions, intact judgment and insight, no apparent memory impairments; her attention and concentration were within normal limits; and her language, knowledge fund, mood, and affect were all appropriate. (R. at 1239–40, 1248–49, 1257–58.)

### b. Six County, Inc.

The record contains a handful of documents from this provider. A mental status

examination on September 11, 2014, revealed that Plaintiff was alert and oriented, her affect was congruent, and her insight and judgment were good, but her mood was depressed. (R. at 991–92.) Plaintiff's updated diagnosis was recurrent, moderate, major depressive disorder, generalized anxiety disorder, and borderline personality disorder. (R. at 994.) A mental status examination on July 13, 2015 revealed that Plaintiff had regular speech, clear and linear thought processes, no overt delusions, intact judgment and insight, no apparent memory impairments; her attention and concentration were within normal limits; and her language, knowledge fund, mood, and affect were all appropriate. (R. at 1538–39.)

### 2. Opinion Evidence

#### a. Consultative Examination by Denise Kohler, Ph.D. ("CE Kohler")

On March 1, 2013, Plaintiff was consultatively examined by CE Kohler. CE Kohler opined that with regard to understanding and memory, Plaintiff was moderately limited in her ability to understand and remember detailed instructions. (R. at 1347.) With regard to concentration and persistence, CE Kohler opined that Plaintiff was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance and be punctual. (*Id*.) CE Kohler further opined that Plaintiff was markedly limited in her ability to sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; and complete a normal day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id*.) With regard to social interaction, CE Kohler opined that Plaintiff was moderately limited in her ability to interact appropriately with the general public and to ask simple questions or request assistance. (*Id*.) CE Kohler

additionally opined that Plaintiff was markedly limited in her ability to accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id*.) With regard to adaptation, CE Kohler opined that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (*Id*.)

### b. James Spindler, M.S. ("CE Spindler")

On October 28, 2014, Plaintiff was consultatively examined by CE Spindler. Plaintiff drove herself to the examination. (R. at 1106.) Plaintiff reported to CE Spindler that she started her day by taking her medications but then went back to bed to sleep until noon. (R. at 1109.) She also reported that during the day she might do chores like dishes and dusting but that her daughter did laundry and other chores. (R. at 1109.) She reported no hobbies other than bird watching, no close friends other than family, and no participation in social groups. (*Id*.) On weekends she might go shopping with her daughter. (*Id*.)

CE Spindler opined a diagnosis of moderate unspecified depressive disorder and moderate unspecified anxiety disorder. (R. at 1109.) He further opined that Plaintiff seemed capable of understanding, remembering, and carrying out instructions in most job settings. (R. at 1110.) CE Spindler wrote that Plaintiff did not appear to have any major difficulty staying focused and she was able to recall five objects after five minutes and accurately recited six digits forward and six digits backwards. (*Id*.) He further wrote, however, that in his opinion it was questionable if Plaintiff had the emotional stamina to sustain working pace and to maintain a level of concentration sufficient for most job settings. (*Id*.) In addition, he opined that it seemed

questionable whether she had the ability to respond appropriately to supervision and coworkers. (*Id*.) Last, he opined that it seemed questionable if Plaintiff had the emotional stamina to respond appropriately to routine work pressures. (*Id*.)

### c. State Agency Reviewers, Karla Voyten, Ph.D. and Mary Hill, Ph.D.

On November 11, 2015, Dr. Voyten reviewed Plaintiff's file and adopted the mental limitations from the RFC that had been assessed by the ALJ who had determined Plaintiff's previous disability claim. (R. at 373.) Specifically, Dr. Voyten opined that Plaintiff was limited to routine, repetitive tasks involving no public contact, no piece rate or production line work, and no close cooperation with others to achieve work tasks. (*Id*.) On March 4, 2015, Dr. Hill reviewed Plaintiff's file and opined the same. (R. at 389–90.)

### d. Jeffrey Christiansen, Psy.D. ("Dr. Christiansen")

Plaintiff was examined by Dr. Christiansen on November 28, 2016. Plaintiff drove herself to the examination. (R. at 1493.) Plaintiff reported that she could handle food stamps independently and could pay the right amount and make change. (R. at 1496.) Plaintiff reported that her social activities included going out to eat with family and friends and using the phone to call family and friends. (*Id*.) She reported her recreational activities included going to the movies and listening to music and that she was interested in engaging in conversations and using the computer. (*Id*.) Nevertheless, she reported that she needed physical assistance when shopping, did not handle money, and did not create her own shopping lists. (*Id*.) She also reported that she did minimal chores around her house and that she needed assistance cleaning, vacuuming, laundry, cooking, and washing dishes. (*Id*.) She also usually had another person drive her where she needed to go. (*Id*.)

Dr. Christiansen opined that, with regard to understanding and memory, Plaintiff was moderately limited with regard to her ability to understand and remember short simple instructions and markedly limited with regard to her ability to understand and remember detailed instructions. (R. at 1492.) Dr. Christiansen opined that, with regard to sustained concentration and pace, Plaintiff was moderately limited with regard to her ability to carry out short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable and length of rests periods. (*Id*.) Dr. Christiansen further opined that Plaintiff was markedly limited in her ability to carry out detailed instructions or maintain attention and concentration for extended periods. (*Id*.) With regard to social interaction, Dr. Christiansen opined that Plaintiff was moderately limited in her ability to interact appropriately with the general public. (*Id*.) With regard to adaptation, Dr. Christiansen opined that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (*Id*.)

**C.     Plaintiff's Records Related to Her Carpal Tunnel Syndrome / Frequent Fingering Limitation**

On October 27, 2014, state agency reviewer, Gary Hinzman, M.D., reviewed Plaintiff's file and opined that Plaintiff had no manipulative limitations. (R. at 372–74.) On February 27, 2015, state agency reviewer, Diane Manos, M.D., reviewed Plaintiff's file and opined the same. (R. at 388–89.)

On September 28, 2016, a nerve conduction study and EMG revealed findings consistent with moderately severe bilateral carpal tunnel syndrome. (R. at 1322.)

On October 10, 2016, and October 23, 2016, Plaintiff was examined by orthopedic surgeon, Clayton Gibson, M.D.  (R. at 1294–1304.)  Dr. Gibson wrote that Plaintiff had thickening of the synovium of the right wrist in the pre-carpal tunnel on the right; exquisite sensitivity to percussion over the median nerve on the right; and positive Phalen's and compression tests.  (R. at 1296, 1302.)  Upon examination, Plaintiff's right hand was normal in appearance, shape, sheen, turgor, and coloration and her arches were preserved.  (R. at 1297, 1302.)  Her right fingers and thumb had full composite range of motion, with no atrophy or clawing.  (*Id*.)  Aside from the sensitivity to percussion over the median nerve, Plaintiff's right flexor tendons were free of crepitance, thickening, triggering, or tenderness.  (*Id*.)  Plaintiff's right extensor tendons were also free of crepitance, thickening, triggering, or tenderness.  (*Id*.)  Plaintiff's right small joints were non tender, free of deformities, contractures and instabilities and had full range of motion.  (*Id*.)  Plaintiff's right thumb joint had a negative shuck and grind test.  (*Id*.)  Plaintiff's right pulses, radial and ulnar, were 5/5.  (*Id*.)  Upon examination, Plaintiff's right wrist had a normal appearance, shape, and coloration. (*Id*.)  There was also no crepitance with motion, catching, clicking or locking.  (*Id*.)  Plaintiff had no localized swelling over her joints.  (*Id*.)  Plaintiff's range of motion was full in 6 degrees of motion— her flexion and extension were 80/80; radial and ulnar deviation were 30/40; and her pronation and supination were 80/80.  (*Id*.)  Plaintiff had no crepitance or catching of the wrist joint with motion or of the distal radial ulnar joint with pronation or supination either in neutral or with the wrist in radial or ulnar deviation or with load.  (*Id*.)  Plaintiff had no tenderness over the snuffbox, the scapholunate, lunotriquetral, and TFCC ligaments, the pisiform, and the hook of Hamate.  (*Id*.)  Watson's shift test and LT ballottement were negative.  (*Id*.)  No midcarpal clunk was present.  (*Id*.)  Plaintff's ECU was not swollen or tender and it did not shift or click.  (*Id*.)  Her grip was

full and 5/5 without pain. (*Id.*)  Her radius was not tender or deformed.  (*Id.*)  Her distal radial

ulnar joint was stable to piano key stress, and had no pain with full supination or pronation.  (*Id.*)

Compression rotation of the sigmoid notch was not painful.  (*Id.*)

X-rays of Plaintiff's right hand were normal.  (R. at 1297–98, 1303.)  Dr. Gibson

diagnosed bilateral carpal tunnel syndrome of moderate severity and advised a carpal tunnel

release on the right.  (R. at 1298, 1303.)

On November 30, 2016, Plaintiff was examined by Shelly Dunmyer, M.D. ("Dr.

Dunmyer").  Dr. Dunmyer's examination revealed that Plaintiff's ranges of motion in her right

and left wrists, fingers, and thumbs were within normal limits.  (R. at 1503.)  Dr. Dunmyer also

found that although Plaintiff's flexion and extension strength in both wrists was 5 out of 5, her

right and left grip strength was a 4 out of 5.  (R. at 1504.)  Dr. Dunmyer opined that Plaintiff was

extremely limited in her fine motor abilities.  (*Id.*)  Dr. Dunmyer wrote that Plaintiff "has

problems due to the numbness and grip strength."  (*Id.*)

At the February 19, 2019, hearing, internist and neurologist Steven Goldstein, M.D.

("ME Goldstein") testified that he had reviewed Plaintiff's file and listened to her testimony

about her impairments.  (R. at 63.)  ME Goldstein testified that Plaintiff's carpel tunnel was not

very severe. (R. at 68.)  He further testified, however, that Plaintiff would be limited to frequent

handling and occasional fingering.  (R. at 68.)  With regard to the occasional handling limitation,

ME Goldstein further explained that Plaintiff "may be able to do more than that" but it was also

"certainly possible that she could do less."  (*Id.*)

On March 20, 2019, Dr. Kelso completed a physical functional capacity questionnaire.

(R. at 2478–83.)  Dr. Kelso answered "yes" when asked if Plaintiff had significant limitations

with respect to reaching, handling, or fingering.  (R. at 2482.)  Dr. Kelso opined that Plaintiff

could spend zero percent of an eight-hour workday grasping, twisting, or turning objects, performing fine manipulations, or reaching.  (*Id.*)  Dr. Kelso indicated, however, that he did not know Plaintiff's prognosis because he was not managing any of her problems aside from restless leg syndrome and that he completed the questionnaire on the basis of patient report.  (R. at 2478.)

## IV.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "take 'into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## V.     ANALYSIS

As previously explained, Plaintiff alleges that the ALJ erred when determining that she was capable of frequent fingering.  (ECF No.15.)  The undersigned agrees.

The determination of a claimant's RFC is an issue reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e), 416.927(e).  Nevertheless, substantial evidence must support the Commissioner's RFC finding.  *Berry v. Astrue*, No. 1:09-cv-411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).  When considering the medical evidence and calculating the RFC, an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions."  *Beck v. Comm'r of Soc. Sec.,* No. 1:10–cv–398, 2011 WL 3584468, at *14, (S.D. Ohio June 9, 2011).  But an "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."  *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x. 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08-cv-828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).  An ALJ must also explain how the evidence supports the limitations that he or she sets forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform

15

sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96-8p, 1996 WL 374184, at *7 (internal footnote omitted).

When assessing Plaintiff's RFC in this case, the ALJ concluded that Plaintiff was capable of frequent fingering.  (R. at 24.)  In arriving that at that conclusion, the ALJ discounted Dr. Goldstein's opinion that Plaintiff was capable of occasional fingering and Dr. Dunmyer's opinion that Plaintiff was extremely limited in her fine motor abilities.  (R. at 1504.)  The ALJ summarized Dr. Goldstein's opinion by writing: "[Dr. Goldstein] indicated that [Plaintiff] could occasionally finger and frequently handle but suggested that it was possible that she could do more."  (R. at 32.)  The ALJ then discounted Dr. Goldstein's opinion and explained why he did so:

> I give significant weight to Dr. Goldstein's opinion overall . . . . However, I do not adopt his suggested limit to occasional fingering, do to the above-summarized longitudinal record documenting very limited treatment for carpal tunnel syndrome, with the claimant seen only briefly in 2016, with no significant follow up, no consistent complaints, no significant persistent physical exam findings to show ongoing problems, and evidence of significant activities of daily living, including driving, that require use of her hands.

(R. at 32–33.)

The undersigned finds that the ALJ's RFC determination is not supported by substantial evidence.  The ALJ correctly noted that Dr. Goldstein opined that Plaintiff was capable of occasional fingering but that she might be able to do more.  The ALJ neglected, however, to explain that Dr. Goldstein also opined that, with regard to fingering, it was possible that Plaintiff was capable of doing *less*.  (R. at 68.)  An ALJ is not required to discuss each piece of evidence or limitation considered, *Conner v. Comm'r*, 658 F. App'x. 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x. 661, 665 (6th Cir. May 21, 2004) (explaining that an

ALJ need not discuss every piece of evidence in the record). An ALJ is not permitted, however, to selectively include only those portions of the medical evidence that places a claimant in a capable light and fail to acknowledge evidence that potentially supports a finding of disability. *See Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x. 771, 777 (6th Cir. 2008) (remand required, in part, because the ALJ was "selective in parsing the various medical reports"); *Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes."). The ALJ's selective summary of Dr. Goldstein's opinion does not allow a reviewing Court to determine if the ALJ considered Dr. Goldstein's opinion in its entirety or if the more limiting aspects of Dr. Goldstein's opinion escaped the ALJ's notice.

The ALJ also discounted the opinions from Dr. Goldstein and Dr. Dunmyer because Plaintiff received "very limited treatment for carpal tunnel syndrome" and there was "no significant follow up by the claimant for carpal tunnel syndrome." (R. at 33.) "In general, it is appropriate for the ALJ to consider a claimant's treatment (other than medication) in evaluating his or her symptoms and pain . . . and a claimant must follow *prescribed* treatment in order to obtain benefits absent good reason." *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x. 498, 507 (6th Cir. 2013) (citing 20 C.F.R. §§ 404.1529(c)(3)(v); 404.1530) (emphasis in the original). Nevertheless, "Social Security Ruling 96–7p strongly suggests that a claimant should be allowed to explain his or her reasons for not pursuing certain treatment options." *Id*. Indeed, SSR 96–7p

provides that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96–7p, 1996 WL 374186, at *7 (July 2, 1996). In this case, Plaintiff testified that she planned to have surgery for her carpal tunnel syndrome but that she wanted to do so after her bladder issues were resolved. (R. at 285–86.) The record also demonstrates, and the ALJ acknowledged, that Plaintiff's "main issue since her filing date" had been her interstitial cystitis. (R. at 31.) However, the ALJ did not acknowledge, let alone consider the soundness, of Plaintiff's explanation that she was delaying her carpal tunnel surgery so that she could first resolve her significant bladder issues.

The ALJ also discounted Dr. Goldstein's opinion because Plaintiff had no "significant persistent physical exam findings to show ongoing problems . . . ." (R. at 33.) But the record does, in fact, contain significant objective findings documenting Plaintiff's condition. For example, the September 28, 2016 nerve conduction study resulted in findings consistent with moderately severe bilateral carpal tunnel syndrome. (R. at 1322.) Plaintiff was also examined by an orthopedic surgeon who diagnosed bilateral carpal tunnel syndrome of moderate severity and advised a carpal tunnel release surgery on her right side. (R. at 1298, 1303.) Dr. Dunmyer examined Plaintiff, and based upon his examination findings, opined that she was extremely limited in her fine motor abilities and had "problems due to the numbness and grip strength." (R. at 1504.) Dr. Goldstein, like Dr. Dunmyer did not conclude that the record lacked sufficient evidence to formulate an opinion. Instead, Dr. Goldstein relied on the available record evidence

to opine that Plaintiff's carpel tunnel syndrome caused her to be capable of only occasional fingering.

The ALJ further found that more extreme fingering limitations were not warranted because there was "evidence of significant activities of daily living, including driving, that require use of her hands." (R. at 33; *see also* R. at 34 (noting that Plaintiff admitted to being able to shop, use a phone, microwave food, and do some chores).) The record reflects, however, more qualified admissions—Plaintiff reported that she drove herself to two evaluation appointments, but that she generally asked others to drive her places. (R. at 1106, 1493, 1496.) Plaintiff also reported that she would go shopping, but that she needed physical assistance to shop, did not handle money, and did not create her own shopping lists. (R. at 1496.) Plaintiff also reported that she did not do much cooking because of issues with her hands and feet and that she mostly microwaved food because she was afraid that she might burn herself. (R. at 277–78, 281.) Moreover, Plaintiff reported that she did minimal chores around her house and that she needed assistance cleaning, vacuuming, laundry, cooking, and washing dishes. (R. at 1496.) The ALJ erred in relying on Plaintiff's modified and sporadic activities to find that she was capable of frequent fingering instead of occasional fingering. First, the terms "occasional" and "frequent" are terms of art in Social Security law. "Occasional" means occurring from very little to up to 1/3 of the time. Social Security Ruling (SSR) 83-10, 1983 WL 31251. "Frequent," however, means occurring from 1/3 to 2/3 of the time. *Id*. The ability to shop and do housework with help is not equivalent to being able to engage in independent use of one's hands. Moreover, "an RFC is not determined in light of what a claimant might be able to unreliably or intermittently accomplish, but serves as a measure of the claimant's capability for sustained work activity." *Ross v. Comm'r of Soc. Sec.*, No. 3:13–cv–20, 2013 WL 6001936, at *9 (citing 20

C.F.R. § 416.945(b)); *see also Gabbard v. Comm'r of Soc. Sec.,* No. 3:11–cv–426, 2012 WL 5378747, at *14 (S.D. Ohio Oct. 30, 2012) ("[T]he ability to perform intermittent and interrupted daily functions such as driving, grocery shopping, or chores, is not evidence of an ability to perform substantial gainful activity." (citing *Walston v. Gardner,* 381 F.2d 586–87 (6th Cir. 1967)).  Here, the record does not support that Plaintiff consistently performed the activities relied upon the ALJ to conclude that she was capable of frequent fingering.

Accordingly, Plaintiff's challenge to the ALJ's determination that she was capable of frequent fingering is well taken.

## VI.  RECOMMENDED DISPOSITION

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability determination and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## VII.  PROCEDURE ON OBJECTIONS

If any party objects to this R&R, that party may, within fourteen (14) days of the date of this R&R, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a *de novo* determination of those portions of the R&R or specified proposed findings or recommendations to which objection is made. Upon proper objections, a Disrict Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the R&R will result in a waiver of the right to have the District Judge review the R&R *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the R&R.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

/s/ *Chelsey M. Vascura*___
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE